UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| THERESA WARRINER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:10-cv-00532-JAW |
| | ) | |
| WAL-MART STORES EAST, LP, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

In this premises liability claim, the Court denies a retailer's motion for summary judgment on the ground that reasonable inferences from a limited record create genuine issues of fact that preclude summary disposition.

**I.     STATEMENT OF FACTS**

    **A.     Procedural History**

By Complaint dated October 26, 2010, Theresa Warriner filed a lawsuit in the Maine Superior Court against Wal-Mart Stores East, LP (Wal-Mart), alleging that on September 4, 2009, she sustained injuries when a glass bottle fell from a shelf and severely lacerated her leg. *State Ct. Record*, Attach. 1 *Compl.* (Docket # 3). On December 30, 2010, Wal-Mart removed the case to this Court. *Notice of Removal* (Docket # 1). On June 27, 2011, Wal-Mart filed a motion for summary judgment accompanied by a statement of material facts. *Def. Wal-Mart Stores East, LP's Mot. for Summ. J.* (Docket # 23) (*Def.'s Mot.*); *Def. Wal-Mart Stores East, LP's Statement of Material Facts in Support of Mot. for Summ. J.* (Docket # 24) (DSMF).

On July 15, 2011, Ms. Warriner responded, opposing the motion and filing a countervailing set of material facts. *Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J.* (Docket # 29) (*Pl.'s Opp'n*); *Pl.'s Reply in Opp'n to Def.'s Statement of Material Facts and Pl.'s Statement of Additional Material Facts* (Docket # 30) (PRDSMF; PSAMF). On July 29, 2011, Wal-Mart replied. *Def. Wal-Mart Stores East, LP's Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J.* (Docket # 32) (*Def.'s Reply*); *Def. Wal-Mart Stores East, LP's Reply Statement of Material Facts* (Docket # 33) (DRPSAMF).

B.   Facts[1]

1.   Theresa Warriner and the Bottle of Perrier

On September 4, 2009, Theresa Warriner and her husband Russell Warriner visited a Wal-Mart store located at 1930 Main Street in Sanford, Maine with the intention of picking up a package of eight ounce plastic bottles of Poland Spring water and retrieving previously-left grocery items. DSMF ¶ 18; PRDSMF ¶ 18; PSAMF ¶ 1; DRPSAMF ¶ 1. Ms. Warriner was in the Sanford store for approximately ten minutes before she suffered an injury to her leg. PSAMF ¶ 2; DRPSAMF ¶ 2. Ms. Warriner contends that as she was walking toward Russell Warriner to put a package of bottled water in her cart, a glass bottle fell from the shelf behind her, lacerating the back of her leg. DSMF ¶ 2; PRDSMF ¶ 2. Ms. Warriner reached to the shelf and placed an eight-pack of water in her husband's cart and turned around and grabbed a second eight-pack of water and placed it in the cart. DSMF ¶ 19; PRDSMF ¶ 19. After placing this second package in the cart,

---

[1] In accordance with "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to Ms. Warriner's theory of the case, consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).

Ms. Warriner turned to speak with her husband and another man. DSMF ¶ 20; PRDSMF ¶ 20. Ms. Warriner did not at any time go anywhere near the bottles of Perrier and she did not knock the bottle off the shelf. PSAMF ¶ 18; DRPSAMF ¶ 18.[2]

Ms. Warriner then heard an explosion in the back of her. DSMF ¶ 20; PRDSMF ¶ 20. As many as five seconds elapsed between the time she turned and the moment the bottle exploded. DSMF ¶20; PRDSMF ¶ 20. After the bottle broke, Ms. Warriner heard a lady scream "she is cut" and she turned around and saw that her leg was bleeding. DRPSMF ¶ 5. The broken Perrier bottle had lacerated Ms. Warriner's leg and the wound was bleeding very fast. DSMF ¶ 24; PRDSMF ¶ 24; PSAMF ¶ 5; DRPSAMF ¶ 5. Ms. Warriner was taken by ambulance to the Goodall Hospital in Sanford. PSAMF ¶ 6; DRPSAMF ¶ 6.[3] At the hospital, she received five staples in her leg. PSAMF ¶ 7; DRPSAMF ¶ 7.

---

[2] In paragraph 18 of her additional statement of material facts, Ms. Warriner posits:

> Ms. Warriner did not at any time go anywhere near the bottles of Perrier. Furthermore, Ms. Warriner did not knock the bottle off the shelf.

PSAMF ¶ 18. Wal-Mart denied this statement on the grounds that Ms. Warriner removed bottles from the shelf adjacent to the bottles of Perrier and that she told Kari Blake Zielke that she had knocked the bottle of Perrier off the shelf when removing her packaged water. DRPSAMF ¶ 18.

In ruling on this motion, the Court is required to accept the non-movant's version of the events and Ms. Warriner did testify in her deposition that she did not "at any time go anywhere near" the bottles of Perrier and that she did not "hit any one of them off at any time." *Theresa Warriner Dep.* at 75:23-24 (Docket # 27). She also testified that it was "an impossibility" that she bumped or moved some of the Perrier bottles as she removed the plastic eight-pack of Poland Spring water. *Theresa Warriner Dep.* at 49:14-25 (Docket # 33). Even though this statement is supported by the record, the Court takes Ms. Warriner's statement that she was not "anywhere near" the Perrier as an exaggeration for the point of emphasis. Ms. Warriner was clearly somewhat near the bottles of Perrier or else she would not have been injured. The Court has accepted Plaintiff's additional statement eighteen with this understanding.

[3] In the Plaintiff's Statement of Additional Material Facts, Ms. Warriner proposed several facts relating to the nature and extent of her injuries. PSAMF ¶¶ 7-10. Wal-Mart objected and moved to strike on the grounds of relevance. DRPSAMF ¶¶ 7-10. The Court has included paragraph seven

3

### 2. Doreen Cardosi Zones the Aisles and Responds to the Scene

On September 4, 2009, Doreen Cardosi worked as the manager of the dry grocery department and front end registers at the Sanford Wal-Mart. DSMF ¶ 4; PRDSMF ¶ 4. Ms. Cardosi arrived at work at 7:00 a.m. on September 4, 2009. DSMF ¶ 5; PRDSMF ¶ 5. One of Ms. Cardosi's first duties was to walk the aisles of the grocery department to "zone them," checking to see that the products, including the water bottles, were shelved in a neat and orderly fashion. DSMF ¶ 6; PRDSMF ¶ 6. It typically takes Ms. Cardosi thirty minutes to one hour to walk through the grocery department. DSMF ¶ 7; PRDSMF ¶ 7.

After people gathered in the bottled water aisle, Ms. Cardosi responded to the scene. DSMF ¶ 36; PRDSMF ¶ 36. Ms. Cardosi observed the glass water bottles on the shelf and noted that they appeared to be shelved properly and neatly in rows. DSMF ¶ 37; PRDSMF ¶ 37. Ms. Cardosi observed that the front rows of the bottles were to the end of the shelf but were not overhanging the shelf. DSMF ¶ 38; PRDSMF ¶ 38.

### 3. Carlton Zielke Zones the Aisles, Responds to the Scene, and Comments About Shelving Practices

On September 4, 2009, Carlton Zielke worked as the department manager for candy and vendors at the Sanford Wal-Mart. DSMF ¶ 8; PRDSMF ¶ 8. Mr. Zielke arrived at the store at approximately 7:00 a.m. DSMF ¶ 9; PRDSMF ¶ 9. As he

---

because the nature of the treatment may say something about the nature of the accident. However, the Court has not included her subsequent treatment because the motion raises only a question of liability, not damages. The Court grants Wal-Mart's motion to strike paragraphs eight through ten of Plaintiff's Statement of Additional Material Facts.

typically did, Mr. Zielke began his day by walking the grocery aisles that are usually stocked by vendors and Wal-Mart associates. DSMF ¶ 10; PRDSMF ¶ 10. It typically takes Mr. Zielke thirty minutes to one hour to walk the aisles and "zone" the products stocked on the shelves. DSMF ¶ 11; PRDSMF ¶ 11. When he zones the shelves, Mr. Zielke sees that the products are lined up neatly on the shelves, that the products are not overhanging the shelves, and that the shelves are fully stocked for customers. DSMF ¶ 13; PRDSMF ¶ 13. As he "zoned" the bottled water aisle the morning of September 4, 2009, Mr. Zielke observed that the water products, including the glass bottles of Perrier water, appeared to be shelved properly. DSMF ¶ 14; PRDSMF ¶ 14. Mr. Zielke observed that the bottles of Perrier were lined up neatly in rows and the front row was brought to the edge of the shelves but the bottles were not overhanging the shelves. DSMF ¶ 15; PRDSMF ¶ 15. Viewed from the aisle, the Poland Spring water was shelved to the left of the Perrier water. DSMF ¶ 16; PRDSMF ¶ 16.[4]

  Mr. Zielke was working in the candy aisle when he heard a bottle fall to the floor and break. DSMF ¶ 21; PRDSMF ¶ 21. It took him only a few seconds to go from the candy aisle to the bottled water aisle. DSMF ¶ 22; PRDSMF ¶ 22. When he arrived at the bottled water aisle, he saw a broken bottle on the floor that appeared to be a bottle of Perrier water. DSMF ¶ 23; PRDSMF ¶ 23. Following the incident, Mr. Zielke observed the shelves containing the Perrier water and noted

---

[4] The Plaintiff interposed a qualified response to paragraph 16 of Defendant's Statement of Material Facts, admitting the statement but adding other facts. PRDSMF ¶ 16. The Court separately incorporated those additional facts into its recitation.

that the rows of Perrier closest to the front of the shelf appeared to be neatly lined up and in order and were not overhanging the shelves. DSMF ¶ 30; PRDSMF ¶ 30.

In his current job for National Distributors, Mr. Zielke stocks individual bottles of non-alcoholic drinks at several Shaw's and Hannaford grocery stores in southern Maine and these products, some of which come in glass bottles, are stocked on flat shelves, are lined up in neat rows, and are brought to the edge of the shelves, as was the manner used for shelving the Perrier water in this case. DSMF ¶ 35; PRDSMF ¶ 35. When employed at the Sanford Wal-Mart, Mr. Zielke received training and education in its safety policies and procedures, a substantial portion of which was implemented by Wal-Mart's "home office." PSAMF ¶ 11; DRPSAMF ¶ 11.[5]

### 4. Kari Blake Zielke Responds to the Scene

On September 4, 2009, Kari Blake Zielke worked at the Sanford Wal-Mart as the dairy manager. DSMF ¶ 39; PRDSMF ¶ 39. Ms. Zielke responded within seconds of hearing the bottle break. DSMF ¶ 40; PRDSMF ¶ 40. She observed the glass bottles of Perrier water on the shelf next to where Ms. Warriner was located and she noticed that the bottles of Perrier appeared to be standing and lined up properly on the shelf in a straight and neat fashion. DSMF ¶¶ 41-42; PRDSMF ¶¶ 41-42. She observed that the Perrier bottles did not appear to be overhanging the shelf. DSMF ¶ 43; PRDSMF ¶ 43.

---

[5] Wal-Mart interposed a qualified response, noting that the store managers and assistant managers control the agenda for the weekly safety meetings held at the store. DRPSAMF ¶ 11. Maybe so, but this fact does not negate paragraph 11 of Plaintiff's Statement of Additional Material Facts.

### 5.     Wal-Mart Shelving Practices

Wal-Mart shelves a number of food products in glass containers, including vinegar, olive oil, barbeque sauces, pickles, jams, jellies, salsa, and spaghetti sauces, at the Sanford store on flat shelves in a way almost identical to the way in which the Perrier water is shelved. DSMF ¶ 32; PRDSMF ¶ 32. In addition to maneuverability space, an additional section of Poland Spring water, specifically "Aquapods," occupied the shelf area between the plastic bottles of water sought by Ms. Warriner and the glass bottles of Perrier. PSAMF ¶ 4; DRPSAMF ¶ 4.[6] In the bottled water aisle where the bottle of Perrier fell, the bottles of Perrier were stored on each shelf, up to and including the top shelf. PSAMF ¶ 4; DRPSAMF ¶ 4. Ms. Warriner agrees that the packages of Poland Spring water were placed on the shelves in a manner such that they did not make contact with the Perrier bottles. DSMF ¶ 25; PRDSMF ¶ 25.

"Bump tests" require Wal-Mart employees to physically "bump" store aisles and shelves to ensure the stability of products contained on the shelves. PSAMF ¶ 12; DRPSAMF ¶ 12.[7] It is Mr. Zielke's experience that bump tests were performed "only when [an item is] on the []top shelf or it looks like it's unsafe and [the employee] thinks it's going to fall off." PSAMF ¶ 17; DRPSAMF ¶ 17.[8] Shelving

---

[6] Wal-Mart interposed a qualified response to paragraph four of Plaintiff's Statement of Material Facts; however, in accordance with summary judgment praxis, the Court has accepted the Plaintiff's version for purposes of the motion.

[7] Wal-Mart interposed a qualified response to paragraph 12 of Plaintiff's Statement of Material Fact; however, in accordance with summary judgment praxis, the Court has accepted the Plaintiff's version for purposes of the motion.

[8] Wal-Mart interposed a qualified response but the Court has accepted Ms. Warriner's statement under the standard summary judgment rubric.

features and display procedures are controlled by Wal-Mart's "home office" and Mr. Zielke is of the opinion that "there is actually very little that [the specific store location or its employees] control . . . that isn't already in control" by someone higher up.  PSAMF ¶ 13; DRPSAMF ¶ 13.  It is Mr. Zielke's experience that the aisle and shelf location of the Perrier bottled water was determined and enforced by Wal-Mart's "home office."  PSAMF ¶ 14; DRPSAMF ¶ 14.  As a non-vendor item, between 2005 and 2009, bottles of Perrier water were not stocked by vendors, but by Wal-Mart employees.  PSAMF ¶ 15; DRPSAMF ¶ 15.  It is Mr. Zielke's experience that "all [of] the shelves at Wal-Mart should basically be set up in a way that if a customer bumped into it, nothing would fall[.]"  PSAMF ¶ 19; DRPSAMF ¶ 19.

Some other Wal-Mart locations have used alternate shelving systems to prevent falling merchandise; examples include rail systems (*i.e.*, lipped shelving), PDQs (*i.e.*, perforated boxing that allows single items to continue to be stored in their stable boxes), case cutting (*i.e.*, boxing units that are physically cut as opposed to being torn at perforation), and shelf fencing (*i.e.*, fence barriers attached to the front of shelves).  PSAMF ¶ 16; DRPSAMF ¶ 16.[9]

### C. Wal-Mart's Position

In essence, Wal-Mart says that Ms. Warriner's claim must fail because she has not produced any evidence that it was negligent.  Wal-Mart maintains that Ms. Warriner's cause of action is bottomed on the erroneous premise that because a

---

[9] Wal-Mart denied paragraph 16 of Plaintiff's Statement of Additional Material Facts, stating that most of these alternate designs are for use with different types of shelving, not the flat shelves used in the Sanford, Maine store.  The Court accepts as undisputed that these are alternate shelving designs to prevent falling merchandise.

8

bottle fell from a Wal-Mart shelf and injured her leg, Wal-Mart must be legally responsible, and that her argument thus violates the well-known precept that "the simple fact that an accident happened or that an injury occurred does not allow one to draw the inference that the accident or injury was caused by negligence or precipitated by the fault of anyone." *Def.'s Mot.* at 3 (citing *Rice v. Sebasticook Valley Hosp.*, 487 A.2d 639, 641 (Me. 1985)).

Wal-Mart concedes that, as she was a patron, it owed a legal duty to Ms. Warriner to provide her with reasonably safe premises for her use. *Def.'s Mot.* at 2 (citing *Belyea v. Shiretown Motor Inn, LP*, 2010 ME 75, ¶ 10, 2 A.3d 276, 279; *Milliken v. City of Lewiston*, 580 A.2d 151, 152 (Me. 1990)). However, Wal-Mart notes that it is not required to guarantee a patron's safety and is only required "to ensure that its premises are reasonably safe, guarding against all foreseeable dangers given the totality of the circumstances." *Def.'s Mot.* at 3 (citing *Hanson v. Madison Paper Co.*, 564 A.2d 1178, 1179 (Me. 1989)). It argues that Ms. Warriner failed to produce "specific evidence that Wal-Mart breached a duty of care and that as a result of that breach that she sustained an injury." *Id.* at 4.

D.   Ms. Warriner's Position

In response, quoting Field, McKusick & Wroth, Ms. Warriner observes that summary judgment "is almost ***always inappropriate in negligence cases***, except to isolate such an issue as *res judicata*, release or the statute of limitations ***because it is usually for the jury to determine whether the conduct in question met the reasonable-man standard***." *Pl.'s Opp'n* at 4 (quoting 2 R. Field, V. McKusick

9

& K. Wroth, MAINE CIVIL PRACTICE § 56.1 at 36 (2d ed. 1970)) (emphasis in Plaintiff's memorandum). Ms. Warriner notes that in *Currier v. Toys 'R' Us*, the Maine Supreme Judicial Court described the legal standard for retail stores like Wal-Mart:

> A duty of reasonable care is conferred upon a defendant store when it knows or should have known of a risk to customers on its premises.

680 A.2d 453, 455 (Me. 1996). Furthermore, Ms. Warriner quotes the *Currier* Court:

> [I]n certain circumstances a store owner who is aware of a risk of a recurring hazardous condition on the premises may be chargeable with constructive notice of the existence of the specific recurrence at issue, though the hazardous condition when it occurs may be transitory.

*Pl.'s Opp'n* at 5 (quoting *Currier*, 680 A.2d at 455).

Ms. Warriner relies heavily on *Filanowski v. Wal-Mart Stores, Inc.*, No. 99-147-B-H, 2000 U.S. Dist. LEXIS 8006 (D. Me. Apr. 6, 2000). In *Filanowski*, the plaintiff argued that Wal-Mart had constructive notice of a dangerous condition in its stores, namely falling merchandise. *Id.* at *12-13. Ms. Warriner says that the *Filanowski* Court concluded it was "fair to argue from the evidence that Defendant had notice that improperly stacked merchandise was a condition which could be dangerous to those on the premises." *Pl.'s Opp'n* at 6 (quoting *Filanowski*, 2000 U.S. Dist. LEXIS 8006 at *14).

More specifically, Ms. Warriner points out that there is evidence that Wal-Mart itself "maintains a number of safety-related policies and procedures," including "bump tests." *Id.* She says that the Sanford Wal-Mart failed to adopt

10

other safety features that have been adopted by other Wal-Marts around the country to prevent this type of incident. *Id.* Ms. Warriner emphasizes Mr. Zielke's statement that "all [of] the shelves at Wal-Mart should basically be set up in a way that if a customer bumped into it, nothing would fall[.]" *Id.* at 10 (quoting PSMF ¶ 19).

    E.    **Wal-Mart's Reply**

In its reply, Wal-Mart first observes that Ms. Warriner quoted an outdated version of Maine Civil Practice and says the newest edition contains a less discouraging view of the use of summary judgment. *Def.'s Reply* at 1 (citing 3 C. Harvey, MAINE CIVIL PRACTICE § 56.1 (3d ed. 2011)). Furthermore, citing *Roney v. Wendy's Old Fashioned Hamburgers of N.Y.*, No. 2:05-cv-109-GZS, 2006 U.S. Dist. LEXIS 11303, *31 (D. Me. Mar. 17, 2006) and *Houde v. Millett*, 2001 ME 183, ¶ 11, 787 A.2d 757, 759, Wal-Mart maintains that summary judgment may be granted in negligence cases if the record would entitle the defendant to judgment as a matter of law if produced at trial. *Id.* Wal-Mart points out that the cases on recurrent condition are inapposite because there is no evidence this case involved a recurrent condition. *Id.* at 2. Wal-Mart also disputes Ms. Warriner's contention that it should have installed safety features and performed a "bump test." *Id.* at 2-4. It says that none of the safety features have prevented this type of accident, noting that they are not designed for the flat shelving that held the Perrier bottle and there is no evidence that, if those safety features had been installed, they would have prevented the accident. *Id.* at 3. It also contends that bump tests are not used

unless glass bottles are stored on top shelves or the items appear unstable. *Id.* at 4. Finally, Wal-Mart argues that Ms. Warriner simply failed to produce evidence of what caused the bottle to fall from the shelf in this case and that to allow the case to go to trial would require the jury to speculate about why the Perrier bottle fell. *Id.* at 4-5.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). For summary judgment purposes, "genuine means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a material fact is one which might affect the outcome of the suit under the governing law." *Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006) (quoting *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218-19 (1st Cir. 2004)) (internal quotation marks omitted). "Neither conclusory allegations nor improbable inferences are sufficient to defeat summary judgment." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236-37 (1st Cir. 2002) (internal quotation marks omitted).

### B. Summary Judgment in Negligence Cases

The Court is not convinced that the judicial view of the availability of summary judgment in a negligence case has fundamentally changed between the 1970 and 2011 editions of *Maine Civil Practice*. In 1970 and today, summary judgment in a negligence case is seldom proper because issues like proximate cause

are mixed issues of law and fact. In *Houde*, the Maine Supreme Judicial Court wrote that the "question of whether a defendant's acts or omissions were the proximate cause of a plaintiff's injuries is generally a question of fact, and a judgment as a matter of law is improper if any reasonable view of the evidence could sustain a finding of proximate cause." 2001 ME 183, ¶ 11, 787 A.2d at 759; *see also Roney*, 2006 U.S. Dist. LEXIS 11303 at *31. The Maine Law Court has confirmed that "[t]he question of causation is generally one of fact to be determined by the fact-finder." *Dyer v. Me. Drilling & Blasting, Inc.*, 2009 ME 126, ¶ 32, 984 A.2d 210, 219.

Seldom does not mean never. As the Law Court explained, "if the evidence produced by the plaintiff in opposition to a motion for summary judgment would, if produced at trial, entitle the defendant to a judgment as a matter of law, the defendant is entitled to summary judgment." *Houde*, 2001 ME 183, ¶ 11, 787 A.2d at 759. "The mere possibility of . . . causation is not enough, and when the matter remains one of pure speculation or conjecture, or even if the possibilities are evenly balanced, a defendant is entitled to a judgment." *Darney v. Dragon Prods. Co., LLC*, 771 F. Supp. 2d 91, 118 (D. Me. 2011) (quoting *Houde*, 2001 ME 183, ¶ 11, 787 A.2d at 759).

### C.  The Elements

To prove her premises liability claim, as with any claim of negligence, Ms. Warriner must prove "(1) duty, (2) breach of that duty, (3) causation, and (4) harm to the plaintiff." *Durham v. HTH Corp.*, 2005 ME 53, ¶ 8, 870 A.2d 577, 579. Wal-

Mart acknowledges that it owed a legal duty to Ms. Warriner and it has not questioned that she was injured by the Perrier bottle on September 4, 2009. The focus of the motion is breach and proximate cause.

### 1. **Breach of Duty**

Wal-Mart presents a strong argument that Ms. Warriner has presented no evidence that it breached its duty to her. Wal-Mart trains its employees on safety procedures. It requires its supervisory personnel to "zone" the aisles and to confirm that the product is properly lined up, not overhanging from the shelf, and fully stocked. In accordance with its safety procedures, both Ms. Cardosi and Mr. Zielke performed these duties on the morning of the accident and confirmed that the Perrier bottles were properly stacked and did not overhang the shelf. Ms. Warriner, however, has accused Wal-Mart of failing to adopt safety measures that its other stores have implemented, including the "bump" test, rail systems, PDQs, case cutting, and shelf fencing. Wal-Mart has defended itself by asserting that these safety methods simply are not applicable to the flat shelves on which the Perrier bottles were stored on September 4, 2009.

Preliminarily, the Court agrees with Wal-Mart that the record in this case does not permit the application of *Filanowski* and its ilk. There is no evidence whatsoever of a recurrent condition and Ms. Warriner's reliance on this judicial precedent fails.

Nevertheless, for purposes of the motion for summary judgment, the factual back and forth between Wal-Mart and Ms. Warriner reveals a genuine issue of

material fact. For example, regarding "bump" tests, Ms. Warriner asserts that bump tests were performed "only when [an item is] on the []top shelf or it looks like it's unsafe and [the employee] thinks it's going to fall off." PSAMF ¶ 17. Wal-Mart interposed a qualified response, noting that the glass Perrier bottles were not stacked on top of each other and that bump tests are "performed on the glass bottles only when the bottles are on the top shelf or when they look unsteady." DRPSAMF ¶ 17. Wal-Mart's response raises a factual question as to whether the Perrier bottle that fell from the shelf should have been subject to the bump test.

Similarly, Ms. Warriner asserts that "[o]ther Wal-Mart locations have implemented additional safety measures specifically designed to prevent falling merchandise, examples of which include rail systems (i.e. lipped shelving); PDQs (i.e., perforated boxing that allows single items to continue to be stored in their stable boxes); case cutting (i.e. boxing units that are physically cut as opposed to being torn at perforation); and shelf fencing (i.e., fence barriers attached to the front of shelves)." PSAMF ¶ 16. Wal-Mart denied this assertion but added that the "other methods of shelving do not involve safety measures added to flat shelving" and that the "Sanford Wal-Mart did not use shelf fencing because the Perrier was on a flat shelf." DRPSAMF ¶ 16.

Whether Wal-Mart could successfully convince a fact-finder that these safety measures would not be usable with flat shelving and whether Wal-Mart should have used flat shelving for glass Perrier bottles are factual questions that require jury resolution. The Court concludes that Ms. Warriner has raised genuine issues

of material fact about whether Wal-Mart breached its duty of reasonable care to her.

### 2.  Proximate Cause

This does not end the discussion. The next question is whether there is any evidence of causation. Here, Wal-Mart has an even stronger argument. The record does not directly explain the most fundamental question: why did the Perrier bottle fall? As a matter of common sense, objects like the Perrier bottle do not spontaneously leap from a flat shelf. There are two possibilities: someone actively put the bottle in a precarious spot or some external force nudged the bottle to a precarious spot. Was the Perrier bottle teetering on the edge of its shelf just before it fell? Was the bottle securely on the shelf at the beginning of the shopping day? Did another customer unintentionally move the bottle when reaching for something nearby? Did a customer intentionally move the bottle and fail to replace it securely on the shelf? Did a Wal-Mart employee move the bottle into its precarious place after a customer picked up a bottle that was first in line? Did Ms. Warriner herself—or another customer—inadvertently bump the bottle or set in motion a series of bumps or vibrations as she reached for the Poland Spring water? How long was the bottle of Perrier in its precarious position? None of these questions is directly answered in the record. In short, the record contains a cascade of unknowns.

Nevertheless, the question before the Court is constrained: whether a jury could reasonably conclude that Wal-Mart's negligence—either what it did or what it

did not do—caused the bottle to fall.  Here, Ms. Warriner asserts as a factual matter that Wal-Mart uses safety methods in other stores that would have prevented a bottle from falling.  She attached photographs of Wal-Mart stores where Wal-Mart is depicted as using at least three of the four safety methods—rail systems, PDQs, case cutting, and shelf fencing—to store bottled water.  PSAMF ¶ 15, Attach. 2-4.  Although Wal-Mart disputes the applicability of these safety methods to the Sanford store, Ms. Warriner has, in the Court's view, generated a jury question as to why Wal-Mart uses these arguably safer storage methods in its other stores and not in Sanford.  Furthermore, even though Ms. Warriner has no expert witness, whether one of the other methods would have prevented the September 4, 2009 accident is a matter of common sense.  It is within the province of the jury to evaluate whether a glass bottle that is fenced onto a shelf, shelved within a cardboard box, or placed behind a shelf with a small exterior ridge would be as likely to fall—either spontaneously or by being nudged—as a bottle on a flat shelf.

It may well turn out that Wal-Mart has a convincing explanation for its flat shelf storage method.  Again as a matter of common sense, flat shelf storage for glass bottles is not exactly unknown in retail grocery stores and none of Ms. Warriner's alternative methods is itself without obvious inherent risks.  Yanking a glass bottle over a small fence, pulling one out of a cardboard enclosure, and bumping a bottle against the small lip at the edge of a shelf all seem to present separate risks of bottle breakage.  But it may simply be that Wal-Mart has concluded that these safety methods, which create slight barriers between the

17

customer and the product, deter sales.  None of this, however, is directly before the Court on this motion and the Court is chary about drawing unsupported inferences in the context of a motion for summary judgment.

### 3. Summary

Based on the record, Wal-Mart's decision to move for summary judgment is fully understandable.  Ms. Warriner has left a substantial evidentiary gap as to how this accident occurred.  For purposes of this motion, this void is filled by the Court's obligation to view the evidence, including reasonable inferences, in a light most favorable to her.  Of course, for purposes of trial, the burden will be on Ms. Warriner to prove her case by a preponderance.

## III. CONCLUSION

The Court DENIES Wal-Mart Stores East, LP's Motion for Summary Judgment (Docket # 23).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 13th day of December, 2011